LEXINGTON MANAGEMENT COMPA-
NY, INC., d/b/a Northview Village,
et al., Plaintiffs,

v.

MISSOURI DEPARTMENT OF SOCIAL
SERVICES, et al., Defendants and
Third-Party Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HEALTH & HUMAN SERVICES, et
al., Third-Party Defendants.

Nos. 86–4424–CV–C–5, 86–4425–CV–C–5.

United States District Court,
W.D. Missouri, C.D.

July 18, 1986.

Harvey M. Teitlebaum, Jefferson City, Mo., for plaintiffs.

JoAnne Morrow, Deputy Director, Missouri Dept. of Social Services, Jefferson City, Mo., for defendants.

E. Eugene Harrison, Asst. U.S. Atty., Kansas City, Mo., for third-party defendants.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

On July 3, 1986, the Court conducted an evidentiary hearing with respect to plaintiffs' prayer for injunctive relief against the State defendants and the State defendants' third-party prayer for injunctive relief against the third-party Federal defendants. For the reasons set forth below, the Court will make the following rulings: (1) the plaintiff nursing home is entitled to full Medicaid funding pending exhaustion of its administrative appeals; (2) the individual plaintiffs lack standing to contest the proposed reduction of Medicaid funding to the nursing home; and (3) the State is entitled to full federal financial participation in the Medicaid funding level it is obliged to give the plaintiff nursing home. Accordingly, the complaint of the individual plaintiffs will be dismissed for lack of standing, the plaintiff nursing home's prayer for injunctive relief against the State will be granted, and the State's prayer for injunctive relief against the federal government will be granted.

## I. FINDINGS OF FACT

1. Lexington Management Company, Inc. (Lexington) is a Missouri corporation which owns and operates Northview Village.

2. Northview Village is a 409–bed nursing home in St. Louis, Missouri, which, prior to June 12, 1986, had been certified as a "skilled nursing facility" (SNF) under both the Medicare and Medicaid programs, and as an "intermediate care facility" (ICF) under the Medicaid program only.

3. Mazie Terrell and Helen Charney are residents of Northview Village.

4. As of July 3, 1986, Northview Village had 313 residents.

5. The Medicaid program is a cooperative state-federal program which provides medical assistance to needy persons. Under the Medicaid program, the federal government provides 60% of the funding and the states provide the other 40%. The states have the primary responsibility for administering the Medicaid program on a state-by-state basis, albeit always in compliance with federal regulations. Federal financial participation under the Medicaid program is paid in lump sums to the states. The states, in turn, make the direct payments to providers such as Northview Village. In addition, provider certification agreements under the Medicaid program run between providers, such as Northview Village, and the states. Thus, the states have primary responsibility for entering into and terminating provider agreements. The federal government is not a party to these provider agreements. Nevertheless, pursuant to "look behind" authority under 42 U.S.C. § 1396i(c),[1] the federal govern-

---

**1.** Section 1396i(c)(1), the "look behind" provision, states:

"The Secretary may cancel approval of any skilled nursing or intermediate care facility at any time if he finds on the basis of a determination made by him as provided in section 1396a(a)(33)(B) of this title that a facility fails to meet the requirements contained in this section 1396a(a)(28) of this title or section 1396d(c) of this title, or if he finds grounds for termination of his agreement with the facility pursuant to section 1395cc(b) of this title. In that event the Secretary shall notify the State agency and the skilled nursing facili-

ty or intermediate care facility that approval of eligibility of the facility to participate in the programs established by this subchapter and subchapter XVIII of this chapter shall be terminated at a time specified by the Secretary. The approval of eligibility of any such facility to participate in such programs may not be reinstated unless the Secretary finds that the reason for termination has been removed and there is reasonable assurance that it will not recur."

Section 1396i(c)(2), in turn, provides for administrative review of the initial decision to decertify a facility under § 1396i(c)(1). In addi-

ment may intervene and cancel a Medicaid provider agreement for noncompliance with basic Medicaid standards.

6. The Medicare program is administered and funded directly by the federal government. Provider agreements run directly between the provider and the United States Department of Health and Human Services. If a nursing home receives Medicare reimbursement, the federal government pays the entire amount and pays that amount directly to the nursing home. The State of Missouri's sole involvement in the administration of the Medicare program is its contract with the federal government to do periodic surveys of Medicare provider facilities to evaluate compliance with federal standards for participation in the program. Under this contract, the State's sole authority is to conduct a survey and report back to the federal agency; the State has no authority to terminate a provider's Medicare eligibility.

7. Otis R. Bowen is the Secretary of the Department of Health and Human Services, which is the federal agency responsible for administering both the Medicare and Medicaid programs.

8. Edward M. Brennan is the Associate Regional Administrator for Health Standards and Quality, Health Care Financing Administration (HCFA), in Region VII of the HHS. Region VII includes Iowa, Kansas, Missouri, and Nebraska. The Secretary has delegated certain functions to the Associate Regional Administrators, including: (1) the certification and decertification of facilities that participate as providers in the Medicare program; and (2) the oversight of provider certification under the Medicaid program.

9. Although Northview Village was certified as an SNF under both the Medicare and Medicaid programs, the facility does not receive at present and *never* has re-

ceived in the past any Medicare funds. In contrast, the vast majority of residents at· Northview Village are certified to receive Medicaid. Northview Village is located on the north side of St. Louis, Missouri. Its residents are primarily elderly, indigent, black persons.

10. It is doubtful that Northview Village would ever receive any Medicare funds in the future even if its Medicare certification remained intact indefinitely.

11. Between March 10, 1986, and March 14, 1986, a team of health care professionals from the regional office of HCFA conducted a survey of Northview Village.

12. According to the testimony of Mr. Brennan, whenever HCFA conducts such a survey, it does so with an eye to the facility's compliance with *all* of its certifications and provider agreements.[2] Accordingly, Mr. Brennan testified, the March 10–14 survey was conducted with an eye to Northview Village's SNF Medicare and Medicaid certifications, as well as its ICF Medicaid certification.

13. Following the March 10–14 survey, Mr. Brennan purported to act with respect Northview Village's SNF Medicare certification first. By a letter dated March 20, 1986, Mr. Brennan notified Northview Village that, pursuant to 42 U.S.C. § 1395cc(b)(2), its SNF Medicare certification would be terminated effective June 12, 1986. This SNF Medicare termination letter was based on the federal agency's March 10–14 survey of Northview Village.

14. This March 20 termination letter further notified Northview Village that, pursuant to 42 U.S.C. § 1395cc(c)(3), the State was being notified of the SNF Medicare certification termination so that it could initiate the procedures for termination of Northview Village's SNF Medicaid certification. Pursuant to 42

---

tion, § 1396i(c)(2) provides that, unless the facility presents an "immediate and serious threat to the health and safety of patients," the provider agreement between the facility and the State "shall remain in effect" pending completion of the administrative appeals process. Thus, in essence, § 1396i(c)(2) provides for pretermination administrative review of the federal agen-

cy's initial decision to decertify a facility under § 1396i(c)(1).

**2.** This is because the terms, conditions, and compliance standards of the Medicare program are identical to the terms, conditions, and compliance standards of the Medicaid program. *See* 42 U.S.C. § 1396a(a)(28).

C.F.R. § 442.20(b),[3] the federal government's termination of a facility's SNF Medicare certification automatically obliges the State to terminate the facility's SNF Medicaid certification as of the same effective date.

15. In sending the March 20 letter, Mr. Brennan intended that termination of Northview Village's SNF Medicare certification would automatically and necessarily result in the termination of the facility's SNF Medicaid certification.

16. By a letter dated April 7, 1986, Mr. Brennan notified Northview Village that, pursuant to the federal government's § 1396i(c)(1) "look behind" authority, HCFA was cancelling the facility's ICF Medicaid certification, effective June 12, 1986. Like the March 20 SNF termination letter, this ICF termination letter was the result of the federal government's March 10–14 survey.

17. Plaintiff Lexington filed timely appeals from both the federal government's SNF termination action and the ICF termination action.

18. The parties are in agreement that, pursuant to 42 U.S.C. § 1396i(c)(2), the Medicaid provider agreement between the State and Lexington will remain in effect pending disposition of Lexington's appeals of the federal government's termination of the facility's ICF Medicaid certification. Thus, under § 1396i(c)(2), it is undisputed that Northview Village is entitled to receive, at minimum, full ICF-level Medicaid funding pending exhaustion of its administrative appeal of the April 7 ICF termination letter.[4]

19. The parties are in sharp disagreement, however, with respect to the issue of whether Northview Village is entitled to receive full SNF-level Medicaid funding pending exhaustion of its administrative appeal of the March 20 SNF termination letter. Indeed, the question of whether Northview Village is entitled to continue receiving full SNF-level Medicaid funding pending administrative appeal is the focal issue in this case. The parties have taken the following positions:

(a) The federal government has taken the position that Northview Village is not entitled to receive SNF-level funding pending exhaustion of its administrative appeals. The federal government bases its position on a mechanical application of three concepts: (1) the March 20 SNF termination letter, by its terms, limited itself to termination of the facility's SNF Medicare certification and did not effect any "official" federal action with respect to the facility's SNF Medicaid certification; (2) there is no statutory or constitutional right to maintain SNF-level funding pending appeal from termination of a facility's Medicare certification;[5] and (3) pursuant to 42 C.F.R. § 442.20(b), the facility's SNF Medicaid certification termination automatically flowed from the SNF Medicare certification termination by operation of law. Thus, the federal

---

3. 42 C.F.R. § 442.20(b) provides:
    "If the Secretary notifies the Medicaid agency [i.e. the State] that he has denied, terminated, a Medicare agreement with a SNF, the [State] must deny, terminate, or refuse to renew its Medicaid agreement with that SNF. The denial, termination, or refusal to renew the Medicaid agreement must be effective on the same date as the denial, termination, or refusal to renew the Medicare agreement."
   This regulation was first promulgated in 1978 and was most recently amended on February 15, 1979.

4. The only time a Medicaid provider agreement which is terminated under § 1396i(c)(1) does not remain in effect pending administrative appeal is when the Secretary makes a written determination "that the continuation of provider status constitutes an immediate and serious threat to the health and safety of patients, and the Secretary certifies that the facility has been notified of its deficiencies and has failed to correct them." 42 U.S.C. § 1396i(c)(2). Although the Secretary had notified Northview Village on May 9, 1986, that he would terminate the facility's SNF *and* ICF Medicaid certifications as an "immediate and serious threat to the health and safety of patients," the federal government found that the facility had adequately addressed its most serious problems and, on May 25, 1986, rescinded its finding of an "immediate and serious threat."

5. *See American Healthcare Corp. v. Schweiker,* 688 F.2d 1072 (7th Cir.1982): *Northlake Community Hospital v. United States,* 654 F.2d 1234 (7th Cir.1981); *Town Court Nursing Center, Inc. v. Beal,* 586 F.2d 266 (3d Cir.1978).

government maintains that, even if the net result of the March 20 letter was the termination of Northview Village's SNF Medicaid certification, it successfully circumvented § 1396i(c)(2) by couching the letter in terms of a SNF Medicare termination. In view of § 1396i(c)(2), the federal government concedes that the facility would have remained entitled to full SNF-level funding pending exhaustion of administrative appeals if it had terminated Northview Village's SNF Medicaid certification directly pursuant to its § 1396i(c)(1) "look behind" authority; however, the federal government maintains that there is a viable distinction between § 1396i(c)(1) Medicaid termination and automatic Medicaid termination by operation of 42 C.F.R. § 442.-20(b), even where, as here, the net effect on the facility remains unchanged.

(2) Plaintiff Lexington has taken the position that, regardless of the label attached to the March 20 SNF termination letter, the net effect of the letter was to terminate Northview Village's SNF Medicaid certification. Consequently, plaintiff maintains that, regardless of whether its Medicaid SNF certification was terminated directly under § 1396i(c)(1) or indirectly by operation of 42 C.F.R. § 442.20(b), it should remain entitled under § 1396i(c)(2) to continue receiving full SNF-level Medicaid funding pending appeal of the operative federal decision.

(3) As a theoretical matter, the State defendants are in agreement with plaintiff that full SNF-level Medicaid funding *should* continue pending exhaustion of the administrative appeals process. As a practical matter, however, the State has aligned itself with the federal government, taking the position that it will not reimburse plaintiff under the Medicaid program at the SNF-level. The State was forced to take this position because the federal government was not going to pay its 60% share with respect to any SNF-level Medicaid reimbursement to plaintiff. Thus, in order to ensure that it would not be shortchanged, the State notified Lexington that, effective June 12, 1986, Medicaid reimbursement to Northview Village would begin accruing at the ICF-level instead of at the SNF-level.

20. The SNF-level at which Northview Village received Medicaid reimbursement prior to June 12, 1986 is $49.93 per resident per day. The ICF-level at which the State and federal government proposed to reimburse the facility after June 12, 1986 is $42.09 per resident per day. Thus, the net effect of the June 12, 1986 cutoff of SNF-level funding was a reduction of $7.84 per resident per day at Northview Village. This reduction translates into a total monthly reduction of approximately $70,-000.00 per month.

21. Without SNF-level funding, Northview Village will be unable to remain open to serve the needs of its patients pending exhaustion of the administrative appeals process. Mr. Mitchell, Mr. Gourley, Ms. Gilles, and Ms. Morgan all testified without contradiction that, if $70,000.00 were cut from the facility's monthly operating budget, the facility would be unable to meet the minimum state standards for ICF-level care. Thus, an immediate cutoff of SNF-level funding would have the practical effect of immediately closing down the facility.

22. If Northview Village was forced to transfer its patients to other facilities and to close down pending exhaustion of its administrative appeals, the practical effect would be to close down the facility permanently. This is because, once the patients were transferred out of Northview Village, it is very unlikely that they would transfer back to the facility even if it prevailed on its administrative appeal.

23. If the Court did not enjoin the defendants from suspending SNF-level Medicaid funding pending exhaustion of administrative appeals, plaintiff Lexington would have no adequate remedy at law. Two observations support this conclusion. First, as noted above, if SNF-level funding is not continued pending appeal, Northview Village will be forced to close down immediately, its residents will be forced to transfer to other facilities, and it is highly un-

likely that they would transfer back to the facility even if it prevailed on its administrative appeal. Thus, denial of SNF-level funding is not merely a partial and temporary suspension of payments, but instead is tantamount to an immediate and permanent shut-down of the facility. Second, even if plaintiff's loss was measurable as a dollar amount, any damages sustained by plaintiff would not be recoverable from the State because of the Eleventh Amendment, *see Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), nor from the federal government because of sovereign immunity. *See Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

24. Enjoining a suspension of SNF-level benefits would keep Northview Village open and would thereby preserve the status quo.

25. The public interest would be served by keeping Northview Village open and thereby preserving the status quo. There was uncontroverted evidence that there is a severe shortage of skilled nursing home beds in the St. Louis metropolitan area. Consequently, if Northview Village was forced to close its doors, its residents would be forced to transfer to nursing homes outside of their hometown. In addition, there was uncontroverted evidence that nursing home residents are susceptible to a phenomenon known as "transfer trauma." This phenomenon—which is oftentimes characterized by a refusal to eat, a general sense of disorientation, or a loss of one's will to live—commonly afflicts nursing home residents who are suddenly forced to vacate familiar surroundings. Transfer trauma has even been directly linked to the deaths of some nursing home residents. The Court finds that the risk of "transfer trauma" is particularly great in the instant case because the residents would have to be transferred out of their urban environment to facilities in rural areas. This transition, particularly the difference in the personalities of the people who would be staffing the facilities, could be extremely disorienting and distressing. In addition, the transition would move the residents far away from their families and friends, thereby cutting down their number of visitors and generally damaging their external support systems.

## II. CONCLUSIONS OF LAW

■ 1. The individual plaintiffs lack standing to challenge the defendants' actions with respect to Northview Village. *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980). Accordingly, the claims of the individual plaintiffs must be dismissed.

■ 2. The Court has jurisdiction over this case under 28 U.S.C. §§ 1331, 1346. The federal government's argument that 42 U.S.C. § 405(h)[6] prohibits the Court from exercising federal question jurisdiction over this case is unfounded for three independent reasons. First, plaintiff Lexington brought this action to enforce compliance with a provision of the Medicaid program—specifically, § 1396i(c)(2)—and not under the Medicare program. Thus, § 405(h) is wholly inapplicable to this case. Second, § 405(h) is not relevant to the main claim herein—that is, plaintiff's claim against the State defendants—because the State defendants are not officers or employees of the federal government. Third, and most important, even assuming *arguendo* that § 405(h) was otherwise applicable, it would not bar the Court's exercise of jurisdiction over this case for one simple reason: the issues raised herein are wholly collateral to the merits of plaintiff Lexington's dispute with the federal government concerning termination of Northview Village's SNF and ICF certifications. The transparent purpose of § 405(h) is to en-

---

6. Section 405(h) provides in relevant part:
   "No action against the United States, the Secretary, or any officer or employee thereof shall be brought under Section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter."

Section 405(h), in turn, is made applicable to the Medicare program by 42 U.S.C. § 1395ii. Significantly, there is no similar provision which makes § 405(h) applicable to the Medicaid program.

sure that individuals and entities exhaust their administrative appeals prior to challenging the Secretary's final decision in federal court. This exhaustion principle is not relevant to the instant lawsuit, however, because the Secretary's position herein is already quite clear. The administrative appeals process will only address whether or not Northview Village's SNF and ICF certifications should be terminated; it will not address whether the facility should continue receiving SNF-level funding pending appeal. Moreover, the exhaustion rule is particularly inappropriate here because the essence of plaintiff's claim is that Northview Village is entitled to full SNF-level funding pending completion of the administrative appeals process. By the time plaintiff exhausts its administrative remedies and obtains the Secretary's "final decision," the instant controversy will be moot. Consequently, the federal government's § 405(h) argument is, in effect, that the suspension of SNF-level funding to Northview Village pending administrative appeals is and should be totally unreviewable. Such an argument falls directly into the teeth of the "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Academy of Family Physicians*, — U.S. —, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986). Indeed, under circumstances similar to the instant case, the Supreme Court recently rejected the federal government's position and held that § 405(h) does not bar judicial review of Medicare regulations. *See id.* 106 S.Ct. at 2141; *see also Abrams v. Heckler*, 582 F.Supp. 1155, 1158 (S.D.N.Y. 1984) (citing cases which held that § 405(h) does not bar judicial review where "the plaintiff does not seek benefits or a money judgment based on a claim of reimbursement for services rendered, but rather, review of agency action unrelated to such disputes"). Consequently, this Court holds that it has subject matter jurisdiction over this cause.

■ 3. Under 42 U.S.C. § 1396i(c)(2), plaintiff Lexington remains entitled to full SNF-level funding pending exhaustion of its administrative appeals. This conclusion flows directly from the fact that, to the extent Mr. Brennan's March 20, 1986 letter required termination of Northview Village's Medicaid SNF certification, such Medicaid SNF certification termination, as a matter of law, constituted action under the federal agency's § 1396i(c)(1) "look behind" authority.

As noted above, the federal government has taken the position that, with respect to Northview Village's SNF certifications, it only acted with respect to the facility's Medicare SNF certification and left the termination of the facility's Medicaid SNF certification to the state agency under 42 C.F.R. § 442.20(b). There are two fundamental reasons, however, why the federal government's argument must fail and why, instead, this Court is obliged to rule that Northview Village's Medicaid SNF certification termination is cognizable only under § 1396i(c)(1).

First, under the particular facts of this case, this Court holds that Mr. Brennan's March 20, 1986 letter was not only notice of Medicare SNF certification termination under § 1395cc(b)(2), but also was in truth and in fact notice of Medicaid SNF certification termination under the federal government's § 1396i(c)(1) "look behind" authority. The following factors support—indeed, mandate—this conclusion: (1) during its March 10–14 survey of Northview Village, the federal government admittedly was reviewing all of the facility's certifications at once; (2) by notifying the State and advising it to take action under 42 C.F.R. § 442.20(b), the federal government clearly intended that its March 20 letter would accomplish the termination of plaintiff's Medicaid SNF certification; (3) based on the same March 10–14 survey, the federal government did exercise its § 1396i(c)(1) "look behind" authority with respect to plaintiff's Medicaid ICF certification; (4) the plaintiff's Medicaid ICF certification and Medicaid SNF certification were to be terminated as of the same effective date; (5) the federal government has been unable to articulate any legitimate reason why it purported to act under 42 C.F.R. § 442.-

20(b) instead of under § 1396i(c)(1);[7] and (6) most importantly, Northview Village has *never* received any Medicare funds, while it serves Medicaid patients almost exclusively. Under these circumstances, this Court cannot help but conclude that the federal government knew and intended that the sole practical effect of its March 20 letter would be to cut off Northview Village's Medicaid SNF certification. The labels used by the federal government do not alter this fact.[8] In short, this Court believes that the federal agency's March 20 letter was merely a clever way of trying to circumvent the obligation under § 1396i(c)(2) to continue SNF–level Medicaid funding to Northview Village pending exhaustion of administrative appeals. Such a subterfuge will not be toler-

ated: to the extent that the March 20 letter effected a termination of plaintiff's Medicaid SNF certification, such action was taken in truth and in fact pursuant to the federal government's § 1396i(c)(1) "look behind" authority and was not accomplished "by operation" of 42 C.F.R. § 442.-20(b).

Second, assuming *arguendo* that the Court took at face value the federal government's contention that termination of plaintiff's Medicaid SNF certification was accomplished "by operation of" 42 C.F.R. § 442.20(b) and not in fact pursuant to § 1396i(c)(1), the Court further holds that the federal government's purported decision to use 42 C.F.R. § 442.20(b) instead of § 1396i(c)(1) constituted a gross and impermissible abuse of discretion.[9]

---

**7.** At the pre-hearing conference conducted June 27, 1986, Mr. Brennan was asked why he chose to accomplish the Medicaid SNF certification termination under 42 C.F.R. § 442.20(b) instead of under § 1396i(c)(1). At that time, neither Mr. Brennan nor the attorneys for the federal government cited *any* reason for this decision; all they could say was that the choice was committed to Mr. Brennan's discretion. Subsequently, the attorneys for the federal government have advanced two possible reasons why Mr. Brennan relied on § 442.20(b) instead of § 1396i(c)(1): (1) where the facility is certified as an SNF under both Medicare and Medicaid, the Secretary lacks authority to proceed under § 1396i(c)(1) because that statute may only be invoked with respect to "Medicaid-only" facilities; and (2) because the existence of a disagreement between the state and federal agencies is a necessary prerequisite to federal intervention under its § 1396i(c)(1) "look behind" authority. As will be discussed below, neither of these purported reasons is legitimate. *See* notes 9 and 10 *infra.*

**8.** It bears emphasis that, notwithstanding its insistence that it had merely intended to allow the State to take care of Northview Village's Medicaid SNF certification pursuant to 42 C.F.R. § 442.20(b), each of the federal government's actions was fully consistent with the exercise of its "look behind" authority under § 1396i. For example, in the March 20 letter, Mr. Brennan informed plaintiff that the State was being notified of the facility's Medicare SNF certification termination so that it could cut off the facility's Medicaid SNF certification on the date specified by the Secretary. According to the federal government, such notification was undertaken pursuant to 42 U.S.C. § 1395cc(b)(3) and 42 C.F.R. § 442.20(b). In point of fact, however, such notification to the plaintiff and to the State was fully and equally

consistent with § 1396i(c)(1), which requires the Secretary to "notify the State agency and the skilled nursing facility" of his decision to terminate Medicaid eligibility "at a time specified by the Secretary."

**9.** At the outset, one of the federal government's key arguments in this entire case must be debunked. The federal government has argued that, even if it had wanted to act on plaintiff's Medicaid SNF certification under its § 1396i(c)(1) "look behind" authority, it would have been powerless to do so. *See* pages 9–11 of Federal Defendants' Brief in Oppoistion to Issuance of a Preliminary Injunction, filed July 3, 1986. This argument is premised on a characterization of § 1396i(c)(1) as "Medicaid-only" statute—that is, the federal government characterizes § 1396i(c)(1) as being properly invoked *only* where the nursing home is certified as a SNF or ICF under the Medicaid program but is not similarly certified under the Medicare program. The federal government further argues that where, as here, a facility is certified as a SNF under both programs, § 1396i may *not* be invoked to terminate the Medicaid SNF certification directly; instead, the argument goes, the federal government is limited to acting on the facility's Medicare certification and then allowing the operation of 42 C.F.R. § 442.20(b) to take care of the facility's Medicaid certification.

In support of this argument, the federal government cites *Lake Bluff Health Care Centre v. Schweiker*, No. 81–C–5100 (N.D.Ill., Sept. 25, 1981), and two paragraphs of legislative history. In *Lake Bluff*, the Court did seem to indicate that the Secretary's § 1396i "look behind" authority is limited to "Medicaid-only" facilities. Turning to the legislative history, the federal government has quoted in its brief the following two paragraphs of the House Report concerning § 1396i(c):

This holding is amply supported by the legislative history underlying § 1396i(c). When Congress enacted § 1396i(c) as part of the Omnibus Reconciliation Act of 1980, it acted with the intent to provide the Secretary with alternatives to immediate, outright terminations of nursing home facilities. *See* H.R.Rep. 96–1167, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Ad.News 5526, 5568–71. Congress recognized that there was a nationwide shortage of SNF beds. *Id.* at 5568. Congress further recognized that alternatives to immediate decertification were desirable to minimize "the need for traumatic transfers of large numbers of patients during the time needed improvements are being made in the facility." *Id.* at 5570. In short, Congress intended to provide mechanisms for preserving the status quo at least until all avenues for achieving compliance had been exhausted or unless the facility presented an immediate threat to the health and safety of patients.

> "The section further authorizes the Secretary to make an independent and binding determination concerning the extent to which SNFs and ICFs *that participate only in Medicaid* meet the requirements of participation in that program, and to terminate the eligibility of any facility that the Secretary finds does not comply with such requirements.
>
> "Under current law, the authority to determine whether an SNF or ICF *that participates in Medicaid but not Medicare* meets the requirements for participation in Medicaid lies solely with the State Medicaid agency. Based on current limited authority, the Secretary has issued regulations directed at assuring that States have followed Federal standards and norms in carrying out their survey and certification programs. However, the Committee is concerned that, without the authority to validate State agency compliance reviews and to make an independent judgment as to the extent of compliance by particular facilities, the Secretary lacks the means necessary to assure that Federal matching funds are being used to reimburse only those SNFs and ICFs that actually comply with Medicaid requirements."

(emphasis supplied by Federal government). H.R.Rep. No. 96–1167, 96th Cong., 2nd Sess., *reprinted in* 1980 U.S. Code Cong. & Ad. News 5526, 5570.

On closer inspection of the legislative history and the plain language of the statute itself, however, it becomes readily apparent that the federal government's "Medicaid-only" characterization of § 1396i(c) is unfounded. Concerning

It bears particular emphasis that § 1396i(c)(2) directly advances Congress' intent by providing for a continuation of certification pending exhaustion of the administrative appeals process. As applied to the instant case, this provision would allow the facility to continue serving its patients without disruption pending appeal. In sharp contrast, the federal government's reliance on 42 C.F.R. § 442.20(b)—which, significantly, had been on the books for years before Congress found it necessary to enact § 1396i(c)—would cut directly against congressional intent by effecting an immediate and irreversible cutoff of Medicaid funds, regardless of the disposition of the administrative appeal. As noted above, *see* Findings of Fact 20–22, suspension of SNF-level benefits will result in the immediate and permanent shutdown of Northview Village. Consequently, the Court holds that the federal government's purported decision to rely on 42 C.F.R. § 442.20(b) to effect an immediate and au-

the legislative history, the Court acknowledges that Congress intended § 1396i(c) to *allow* the Secretary to take direct action against a facility that participates in Medicaid but not Medicare. Nevertheless, there is absolutely *no* indication in the legislative history that the "look behind" authority contained in § 1396i(c) was to be *limited* to situations involving "Medicaid-only" facilities. To the extent that the portions of legislative history cited by the federal government so indicate, they have been taken out of context.

Indeed, the plain language of the statute itself conclusively demonstrates that Congress intended for the Secretary to have and utilize his § 1396i(c) "look behind" authority even where, as here, he first determined that the facility had violated the terms of its Medicare certification. Section 1396i(c)(1) expressly provides that the Secretary may cancel a facility's Medicaid SNF certification pursuant to his "look behind" authority if he finds that the facility is out of compliance with basic Medicaid standards "*or if he finds grounds for termination of his [Medicare] agreement with the facility pursuant to Section 1395cc(b) of this title.*" Thus, it is apparent that Congress specifically contemplated that the Secretary might invoke his § 1396i(c) authority with respect to the Medicaid certification of a facility even where, as here, he had contemporaneously decided to decertify the facility under Medicare pursuant to § 1395cc(b). Accordingly, the federal government's contention that it lacked any discretion to utilize § 1396i(c) with respect to Northview Village's Medicaid SNF certification is directly controverted by the plain language of the statute itself.

tomatic termination of SNF-level Medicaid funding to Northview Village, instead of taking the less drastic alternative embodied in § 1396i(c) flies in the face of congressional intent and, therefore, constitutes a gross and impermissible abuse of discretion.[10]

4. Under the Medicaid program, the State is directly and primarily responsible for funding providers, such as Northview Village, at the proper level. *See* 42 U.S.C. § 1396a(a)(30).

5. Because the State has unequivocally indicated that, in accordance with the federal agency's directions, it will not fund Northview Village at the SNF-level for charges incurred subsequent to June 12, 1986, and because such action would violate § 1396i(c)(2), the Court will enjoin the State defendants from suspending SNF-level Medicaid funding to Northview Village pending completion of the administrative review process.

6. Under the Medicaid program, the federal government is obligated to reimburse the State at the appropriate rate for all allowable disbursements by the State. *See* 42 U.S.C. § 1396b.

7. Because the federal government has unequivocally indicated that it will not reimburse the State for SNF-level funding to Northview Village after June 12, 1986, and because such action would violate the federal government's obligation to pay its fair share under the Medicaid program, the federal defendants will be enjoined from withholding federal financial participation from the State with respect to SNF-level Medicaid funding to Northview Village.

8. In view of the Eleventh Amendment, *see Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662, and the doctrine of federal sovereign immunity, *see Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), this Court can only grant prospective relief in this case. Here, the cutoff of SNF-level funding was to take effect on June 12, 1986. On June 30, 1986, the Court entered a Temporary Restraining Order which reinstated SNF-level funding to Northview Village. At the July 3, 1986 hearing, the Court further indicated that the TRO would be extended for ten additional days, to and including July 20, 1986, as permitted by Fed.R.Civ.P. 65(b). Thus, plaintiff Lexington has been effectively protected from June 30 through the date of this Order. However, with respect to the period between June 12 and June 30, the Court cannot afford plaintiff any retroactive relief.

In accordance with the foregoing, it is hereby

ORDERED that the complaint filed by the individual plaintiffs in Case No. 86–4425 is dismissed for lack of standing. It is further

ORDERED that the State defendants, including the Missouri Department of Social Services, Joseph J. O'Hara, the Missouri Division of Family Services, William Siedhoff, the Missouri Division of Medical Services, Jane Y. Kruse, the Missouri Division of Aging, Lloyd V. Conley, and their

---

**10.** One final point merits discussion. The federal government has suggested that it would have been improper for the Secretary to exercise his § 1396i(c) "look behind" authority with respect to Northview Village's Medicaid SNF certification because the "look behind" authority may be invoked only when there is some disagreement between the state and federal agencies over whether the facility is in compliance. Indeed, there is some authority which supports this proposition. *See* H.Conf. Report 96–1479, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Ad. News 5903, 5931–32. Be that as it may, the federal government is foreclosed from making such an argument under the facts of this case. Here, the Secretary admittedly used his § 1396i(c) "look behind" authority with respect to Northview Village's Medicaid ICF certification. Thus, if a disagreement between the state and federal agencies was a prerequisite to invocation of the Secretary's "look behind" authority, such a disagreement was fully evidenced by the Secretary's invocation of his "look behind" authority with respect to the facility's Medicaid ICF certification. On the other hand, if no disagreement was necessary to invoke "look behind" with respect to the Northview Village's Medicaid ICF certification, the existence of a disagreement should not suddenly appear as a prerequisite to invoking "look behind" with respect to the facility's SNF certification. In either event, the federal government's position must be consistent.

respective officers, agents, employees, and attorneys, are hereby enjoined from: (1) cancelling or causing the cancellation of plaintiff Lexington's Medicaid Provider Agreement as a Skilled Nursing Facility until such time as plaintiff Lexington has exhausted its administrative remedies before the federal agency; or (2) failing to reimburse plaintiff Lexington at the Medicaid SNF-level for each day of care provided to each Medicaid-eligible resident in its facility from June 30, 1986 until such time as plaintiff Lexington has exhausted its administrative appeals before the federal agency. It is further

ORDERED that plaintiff Lexington's original injunction bond of $50.00 is continued in the same amount. It is further

ORDERED that the federal defendants, including the United States Department of Health and Human Services, Otis R. Bowen, the Health Care Financing Administration, Edward M. Brennan, and their respective officers, agents, employees, and attorneys, are hereby enjoined from reducing, offsetting, disallowing, or otherwise refusing to pay to the State any federal financial participation relating to SNF-level Medicaid payments from the State to Lexington as required by this order, for any time from June 30, 1986 until such time as Lexington exhausts its administrative appeals before the federal agency. It is further

ORDERED that, with respect to the injunctive relief granted in favor of the State and against the federal government, no injunction bond shall be required.