ANADAC, INC., Plaintiff,

v.

UNITED STATES DEPARTMENT OF JUSTICE, IMMIGRATION AND NATURALIZATION SERVICE, Defendant,

and

Digital Biometrics, Inc., IntervenorDefendant.

Civil Action No. 99–169(RMU).

United States District Court, District of Columbia.

Feb. 19, 1999.

John Rogovin, Alfred M. Wurglitz, Jessica Davidson Miller, O'Melveny & Meyers LLP, Washington, DC, for plaintiff.

Beverly Rogovin, Special Asst. U.S. Atty., Washington, DC, for defendant.

Craig A. Hoover, Thomas L. McGovern, III, Hogan & Hartson LLP, Washington, DC, for Digital Biometrics, Inc.

### MEMORANDUM OPINION

URBINA, District Judge.

**Denying Plaintiff's Request for a Preliminary Injunction**

## I. INTRODUCTION

This matter comes before the court on the motion of Plaintiff ANADAC, Inc. ("ANADAC") for a preliminary injunction to enjoin, during the pendency of this action, Defendant United States Department

of Justice, Immigration and Naturalization Service ("INS") from proceeding with performance of the contract awarded to Intervenor–Defendant Digital Biometrics, Inc. ("Digital Biometrics" or "DBI") for 276 live-scan fingerprint systems. ANADAC also moved for expedited discovery and to shorten the time for response. Additionally, the INS submitted a surreply memorandum in opposition to the plaintiff's request for a preliminary injunction, and ANADAC filed a motion to strike the surreply.

Having considered the plaintiff's motion, and oppositions thereto, as well as the administrative record, the court concludes that the plaintiff has failed to show a substantial likelihood of success on the merits. Accordingly, the court denies the plaintiff's motion for a preliminary injunction. Because of this ruling, the court also denies ANADAC's motion for expedited discovery and to shorten the time for response. Additionally, the court will not grant the INS leave to file its surreply memorandum, and the court will deny as moot ANADAC's motion to strike the surreply.

## II. BACKGROUND

On September 10, 1998, the INS solicited a price quote for the purchase of 276 live-scan electronic fingerprint scanning systems. (Def.'s Opp'n at 2.) The INS planned to use these fingerprint scanning systems to capture the fingerprint images of naturalization applicants and to electronically submit the images to the Federal Bureau of Investigation. (Compl. at ¶ 8.) The INS sought this system after Congress inserted a provision in the 1998 Department of Justice Appropriation Act disallowing the use of fingerprint cards in criminal background checks. (Administrative Record, Tab 2, p. 1.)

The INS sought proposals from three companies, including ANADAC and Digital Biometrics, using the Blanket Purchase Agreement method of simplified acquisition set forth in Part 13 of the Federal Acquisition Regulations ("FAR").[1] (*See* Compl. at ¶ 9.) The INS request included a Statement of Work, which set forth the technical and contract requirements. The Statement of Work stated that the INS would select a contractor "based upon the lowest price proposed, with the condition that the apparent lowest-priced bidder will have to demonstrate that their [sic] equipment meets the requirements of this Statement of Work, prior to the award of the order." (Compl. at ¶ 10.) The Statement of Work indicated that the demonstration would occur within five days after the due date and that the INS would evaluate the live-scan systems in accordance with FAR section 11.801 ("under comparable in-use conditions"). (Compl. at ¶ 10.) The Statement of Work stated that deliveries would be "done according to the criteria specified in the BPA ['Blanket Purchase Agreement']." (Administrative R., Tab 10, C.5.)

The three companies submitted bids by the September 18, 1998 closing date. (*See* Mem. of Intervenor in Opp'n at 12.) ANADAC submitted its bid for $9,103,883, (Compl. at ¶ 13), and Digital Biometrics submitted its bid for $8,828,544, $425,338 less than ANADAC's, (Mem. of Intervenor in Opp'n at 12). The INS selected Digital Biometrics as the apparent low bidder and invited Digital Biometrics to demonstrate its compliance with the technical requirements of the Statement of Work on September 23, 1998. (Compl. at ¶ 14.)

On the following day ANADAC wrote to the INS and indicated its disappointment at not being the low price bidder. (*See*

1. A Blanket Purchase Agreement is a simplified method of filling anticipated repetitive needs for supplies or services by establishing "charge accounts" with qualified sources of supply. 48 C.F.R. § 13.303–1(a). Federal Supply Schedule contracts "underlie" Blanket Purchase Agreements. (*Cf.* Administrative

R., Tab 9.) The Federal Supply Schedule program provides Federal agencies with a simplified process for obtaining commonly used commercial supplies and services at prices associated with volume buying. 48 C.F.R. § 8.401(a).

Administrative R., Tab 18.) ANADAC wrote that in response to this "emergent competitive situation," it was pleased to inform the INS that it would offer a new, reduced price bid, which it attached to the letter. (*Id.*) The new bid came to _____ (*Id.*)

On September 25, 1998, ANADAC filed a protest with the General Accounting Office, alleging that Digital Biometrics had failed the technical demonstration and that Digital Biometrics intentionally misrepresented its ability to meet the financial requirements of the Statement of Work. (*See* Administrative R., Tab 19, pp. 5–7.) By letter dated October 7, 1998, the Comptroller General of the United States dismissed the protest because the INS had not yet awarded the contract for live-scan fingerprint systems, making the protest anticipatory. (Administrative R., Tab 21.)

On January 4, 1999, approximately three months after the first technical demonstration, the INS again invited Digital Biometrics to demonstrate compliance with the technical requirements specified in the Statement of Work. (Compl. at ¶ 22.) On January 8, 1999, the INS notified ANADAC that it had awarded the contract to Digital Biometrics as the low price offeror. (Compl. at ¶ 16.) The contract specified an eleven-month delivery schedule, with the first twelve systems due during the first two months of the contract, followed by an additional forty by the end of the fourth month. (Compl. at ¶ 18.)

ANADAC subsequently brought this seven-count suit, filed under seal, seeking declaratory and injunctive relief to enjoin the INS from proceeding with performance of the contract. ANADAC alleges violations of the Administrative Procedure Act, 5 U.S.C. §§ 701–706; the Competition in Contracting Act, 41 U.S.C. §§ 253 *et seq.;* and the Federal Acquisition Regulations, 48 C.F.R. Chapter 1.

ANADAC's suit centers on three claims. First, ANADAC asserts that Digital Biometrics failed to demonstrate its ability to comply with the technical requirements of the Statement of Work and that the INS engaged in improper communications with Digital Biometrics for the purpose of bringing its systems into technical compliance. Second, ANADAC asserts that Digital Biometrics does not have the financial ability to satisfy the contract. Third, ANADAC asserts that the INS improperly allowed Digital Biometrics a relaxed, eleven-month delivery schedule, rather than a 90– or 120–day schedule specified in Digital Biometrics's Blanket Purchase Agreement and Federal Supply Schedule.

ANADAC also moved for expedited discovery and to shorten the time for response. Subsequently, by consent motion, the INS agreed to provide the Administrative Record to ANADAC and Digital Biometrics; the parties agreed to an expedited scheduling order; and ANADAC agreed it would not pursue its application for a temporary restraining order until February 19, 1999. This Memorandum Opinion addresses ANADAC's motion for a preliminary injunction.

## III. ANALYSIS

### A. Standard for Preliminary Injunction

■ A preliminary injunction may be granted only when the plaintiff demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable harm will result in the absence of the relief requested; (3) that no other party will be harmed if the motion is granted; and (4) that the public interest supports granting the requested relief. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir. 1977); *accord Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958); *Marine Transp. Lines, Inc. v. Lehman,* 623 F.Supp. 330, 335 (D.D.C.1985).

ANADAC's suit centers on three issues: Digital Biometrics's demonstration of its ability to meet the technical requirements of the Statement of Work, the INS's as-

sessment of Digital Biometrics's financial ability to provide the 276 live-scan systems, and the eleven-month delivery schedule. For the reasons stated below, the court concludes that ANADAC has not demonstrated a substantial likelihood of success on the merits on any of these claims.

## B. Demonstration of Technical Requirements

ANADAC alleges that at the September 23, 1998 demonstration Digital Biometrics failed to demonstrate several of the Statement of Work requirements. Specifically, ANADAC alleges that Digital Biometrics failed to demonstrate compliance in the areas of electronic interfacing, incorporation of bar code data, and incorporation of live-scan data structure. Because of these alleged failures, ANADAC asserts that the INS waived these Statement of Work requirements when it awarded the contract to Digital Biometrics. (Compl. at ¶¶ 41–44.)

ANADAC further alleges that after Digital Biometrics failed the first technical demonstration, the INS unlawfully afforded Digital Biometrics three months to attempt (unsuccessfully) to cure its deficiencies. Additionally, ANADAC alleges that during that period the INS provided Digital Biometrics with improper assistance by aiding Digital Biometrics in curing its deficiencies. (Compl. at ¶¶ 45–48.) Further, ANADAC alleges that Digital Biometrics intentionally misled the INS with respect to Digital Biometrics's ability to comply with the technical requirements of the Statement of Work, and through these misrepresentations Digital Biometrics induced the INS to enter into the contract for live-scan systems. (Compl. at ¶¶ 49–52.)

ANADAC omitted providing any basis for its factual assertions that Digital Biometrics failed its technical demonstration. The INS and Digital Biometrics, on the other hand, each provided affidavits from individuals with first-hand knowledge of the events surrounding these allegations.

The INS provided the affidavit of Timothy Biggs, Section Chief of the INS's Biometrics Identification Systems Section. (Def.'s Opp'n Ex. 1 at 1.) Timothy Biggs personally witnessed the September 23, 1998 demonstration. (Administrative R., Tab 15; Def.'s Opp'n Ex. 1 at 2.) Timothy Biggs stated that Digital Biometrics successfully completed the technical demonstration. (Def.'s Opp'n Ex. 1 at 2.)

> The demonstration went very smoothly and without any errors, problems or deficiencies. Based on that demonstration and my knowledge of the technology involved in live scan fingerprint systems, as well as my understanding of the INS systems to which such equipment must interface, I concluded that DBI's proposed equipment met or exceeded all material requirements in the SOW ["Statement of Work"].

(Def.'s Opp'n Ex. 1 at 2.)

Timothy Biggs also had responsibility for conducting the second demonstration. (Def.'s Opp'n Ex. 1 at 3.) In his declaration he explained that the INS conducted the January 4, 1999 demonstration for the purpose of better documenting the results of Digital Biometrics's technical demonstration. (*See* Def.'s Opp'n Ex. 1 at 3.)

> The second test demonstration was, in fact, solely conducted to appease INS procurement and legal office personnel who wanted to ensure that INS observers duly noted and reduced to writing as test procedures took place, the extent to which, once again, the relevant DBI equipment satisfied INS's SOW requirements.

(Def.'s Opp'n Ex. 1 at 3.) As with the first demonstration, Timothy Biggs stated, Digital Biometrics successfully demonstrated all required capabilities. (Def.'s Opp'n Ex. 1 at 3.)

Patrick Lyden, a subcontractor who worked for the INS as a technical consultant, also provided a statement. (Def.'s

Opp'n Ex. 2 at 1.) He, too, was present at the September 23, 1998 technical demonstration. (Administrative R., Tab 15.) In his declaration, Patrick Lyden stated that Digital Biometrics's demonstration went perfectly, "meeting or exceeding the functional requirements" outlined in the Statement of Work. (Def.'s Opp'n Ex. 2 at 1.)

The declarations of these two individuals indicate that Digital Biometrics did, in fact, successfully perform its technical demonstration. In addition to not providing the court with any basis for its belief that Digital Biometrics did not successfully complete the technical demonstration, ANADAC also did not provide any rebuttal to these statements. Rather, ANADAC noted that the INS did not address the "irregularities" that prompted the INS procurement and legal office personnel to recommend a second demonstration. (Reply Mem. at 16.)

Because of the lack of a basis for alleging that Digital Biometrics unsuccessfully complied with the technical requirements of the Statement of Work, as well its inability to rebut the observations of individuals present at the demonstration, the court views ANADAC's assertion of unsuccessful technical compliance as a bald assertion.[2] Consequently, the court concludes that ANADAC failed to demonstrate a substantial likelihood of success on the merits on the question of Digital Biometrics's technical demonstration. Accordingly, the court cannot award ANADAC the preliminary injunction it seeks on this basis. *Marine Transp. Lines*, 623 F.Supp. at 335.

## C. The INS's Assessment of Digital Biometrics's Financial Responsibility

■ Likewise, the court concludes that ANADAC failed to demonstrate a substantial likelihood of success on the merits with respect to its assertion that the INS incorrectly assessed Digital Biometrics's financial ability to perform the contract. In this respect, ANADAC alleges that the INS erred by concluding that Digital Biometrics had the financial responsibility necessary for delivering the 276 live-scan systems in accordance with the delivery schedule requirements of the Statement of Work. (Compl. at ¶¶ 53–56.)

More specifically, ANADAC alleges that Digital Biometrics has a longstanding history of financial problems. (Compl. at ¶ 24.) Regarding these allegations, ANADAC provided a press release to show the basis for its beliefs. (Compl.Ex. 8.) The press release shows that Digital Biometrics has lost money every year since its inception, losing $4.9 million on revenue of $11.3 million over the past five years. (*See* Compl. Ex. 8 at 1.) Additionally, a delay in shipments of live-scan fingerprint systems to the Los Angeles County Sheriff's Department hurt Digital Biometrics's financial performance in the most recently reported quarter. (*See* Compl. Ex. 8 at 2.) These financial setbacks, ANADAC argues, would cause the INS to incur additional costs, in terms of technical staff, equipment and support staff, not included in Digital Biometrics's proposal. (*See* Compl. ¶¶ 25–26.)

In response to these allegations, Digital Biometrics provided the affidavit of Barry Fisher, its Vice–President for Sales and Marketing. (Intervenor's Opp'n Mem. Ex.) Barry Fisher stated that Digital Biometrics installed new management in 1997, and since then various indicators of Digital Biometrics's financial health have consistently improved. (*Id.*) For example, the company's losses decreased for each of the last two years, with operating losses for 1998 being 58% smaller than for 1996. (*Id.*) Additionally, gross margins improved from 9% in 1997 to 25% in 1998, and the company reduced operating expenses by nearly 40% from 1996 to 1998. (*Id.*)

Thus, ANADAC interprets Digital Biometrics's loss of revenue as a sign of Digi-

---

**2.** The court's finding on Digital Biometrics's successful technical demonstration renders moot ANADAC's allegation of improper technical assistance by the INS.

tal Biometrics's lack of financial health, whereas Digital Biometrics (while not disputing the losses) points to the installation of new management and the company's subsequent steady improvements in its financial situation as an indication of improved financial health. ANADAC provides no facts to rebut Digital Biometrics's conclusion. To be determined financially responsible, a prospective contractor must have adequate financial resources to perform the contract, or the ability to obtain them. 48 C.F.R. § 9.104–1.

Based on this record, the court finds a reasonable basis existed for the INS's financial responsibility determination. *See M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion."). Further, particular deference is due a contracting officer's determination involving the responsibility of a bidder to perform under the contract. *See Inter–Con Securities Systems v. Orr,* 574 F.Supp. 250, 254 (D.D.C.1983) (citing *Trilon Educ. Corp. v. United States,* 578 F.2d 1356, 1358 (Ct.Cl.1978)). Accordingly, on the basis of the record before the court now, the court concludes that ANADAC has not demonstrated a likelihood of success on the merits on the issue of the INS's determination of Digital Biometrics's financial responsibility.

**D. The Eleven–Month Delivery Schedule**

ANADAC claims that it proposed its bid based on a 60–day delivery schedule, as "required" by the terms of its Blanket Purchase Agreement. Because of this, ANADAC asserts, it calculated into its bid the extra cost of adding a second shift at its factory, as well as "borrowing" live-scan units designated for other customers. (Compl. at ¶ 23.) It bid on this basis, ANADAC claims, because the Statement of Work required bidders to make their offers comply with the terms of each bidder's Blanket Purchase Agreement.

ANADAC asserts that with respect to Digital Biometrics the INS either waived or changed the requirement that the bids must comply with the terms of the Blanket Purchase Agreement. Specifically, ANADAC asserts that Digital Biometrics's Blanket Purchase Agreement and Federal Supply Schedule called for a 90–day or 120–day delivery schedule whereas the INS's order provided a delivery schedule set out over an eleven-month span. ANADAC asserts that this discrepancy, *i.e.,* 90 to 120 day delivery term in the Blanket Purchase Agreement versus the eleven-month delivery schedule set out in the order, reflected the INS's waiver or change of the terms of Digital Biometrics's Blanket Purchase Agreement.

By waiving or changing the requirement that Digital Biometrics must comply with the terms of its Blanket Purchase Agreement, ANADAC alleges, the INS placed it (ANADAC) at a competitive disadvantage. ANADAC further alleges that this change or waiver violated federal procurement of goods laws and constituted an arbitrary and capricious agency action lacking a rational basis.

Based on the record before the court at this stage in the litigation, the court concludes that ANADAC has not demonstrated a likelihood of success on the merits on this claim. Digital Biometrics's Federal Supply Schedule, dated September 8, 1998, (and covering the contract period of September 1, 1998, to August 31, 2003) includes the term that the time of delivery after receipt of order shall be 90—120 days for "normal" orders and on a case-by-case basis for expedited orders. (Administrative R. Tab 7, p. 1C.) The INS argues that this constitutes a delivery "term," not a delivery "schedule." The INS argues that Digital Biometrics's Blanket Purchase Agreement did not contain a delivery schedule; rather, it described the delivery terms based on receipt of orders. (*See* Def.'s Opp'n at 12.) In other words, the

Blanket Purchase Agreement contained delivery terms that depended upon the placement of orders and did not represent a standalone contract. (*See* Def.'s Opp'n at 13.)

This distinction means that the Statement of Work (which specified the terms of the Blanket Purchase Agreement, thereby incorporating the terms of the Federal Supply Schedule) required Digital Biometrics to stand ready to deliver live-scan systems by 90 to 120 days after the INS placed its order (for normal orders). Likewise, the INS could not require the delivery of any live-scan systems from Digital Biometrics in less than 90 to 120 days on a normal basis.

Thus, these delivery terms did not impose an affirmative requirement on the INS to require delivery within the specified "terms" (*i.e.*, 90 to 120 days). Rather, the terms act as an affirmative requirement to deliver within that time frame *if* requested by the INS. Consequently, these terms did not mandate that Digital Biometrics must deliver all 276 systems within 90 to 120 days after the award of the contract (unless the INS chose to order all 276 systems within that time frame). ANADAC, on the other hand, argues that the contract for 276 live-scan systems constitutes the "order," meaning that Digital Biometrics's Federal Supply Schedule requires delivery within 90 to 120 days of the contract date, assuming a normal order.

The INS's explanation of the delivery schedule appears plausible. The INS's "Order for Supplies or Services," awarded to Digital Biometrics on January 5, 1999, included the following "Delivery Schedule":

| Months After Award | Quantity |
| --- | --- |
| 2 | 12 |
| 3 | 20 |
| 4 | 20 |
| 5 | 30 |
| 6 | 30 |
| 7 | 30 |
| 8 | 30 |
| 9 | 30 |
| 10 | 40 |
| 11 | 34 |
| Total | 276 |

(Administrative R., Tab 29.)

Applying the agency's explanation, when the INS placed its order with Digital Biometrics in January 1999, it had to allow Digital Biometrics the period of time specified in the Blanket Purchase Agreement before it could require Digital Biometrics to deliver the live-scan systems. Thus, the INS had to allow Digital Biometrics a minimum of 90 to 120 days notice for the normal part of the order, and it had to work out delivery on a case-by-case basis for the expedited part of the order. Conversely, Digital Biometrics had to be ready to deliver any systems ordered within 90 to 120 days for normal orders and on a case-by-case basis for expedited orders.

Hence, as the delivery schedule shows, the INS's order required Digital Biometrics to deliver the first twelve systems in sixty days (the expedited portion of the order) and the remaining 264 live-scan systems after a 90-day period. Apparently Digital Biometrics found the delivery requirement for the first twelve units acceptable in that it fell within case-by-case basis for expedited orders, as specified in the Federal Supply Schedule. Because the court finds the INS's explanation of the delivery requirements plausible, the court rules that ANADAC has failed to establish that the INS waived or changed the terms of the Statement of Work with respect to Digital Biometrics's delivery schedule.

"It is a fundamental principal of government procurement law that an agency must treat all offerors equally and evaluate their offers consistently against the solicitation's requirements." *Infrared Techs. Corp.*, B–255709.2, 95–2 CPD ¶ 132 (C.G. Sept. 14, 1995). The affidavits of ANADAC's and Digital Biometrics's representatives indicate that each party gave the same interpretation to the Statement of Work's delivery requirements. Additionally, both parties bid on the contract on the same basis. In this respect, as Barry Fisher stated in his affidavit,

at no time during the bidding process did Digital Biometrics ever propose an 11–month schedule or any relaxation or extension of the schedule. As Digital Biometrics' proposal makes clear, Digital Biometrics bid for the award on the basis of 60 day delivery.... It was the INS who asked that the products be delivered over an 11–month period, and Digital Biometrics first learned where and when the agency wanted to receive delivery at the time Digital Biometrics received the award on January 5, 1999. (Intervenor's Opp'n Mem. Ex. at ¶ 12.)

Based on the record at this stage of the litigation, the court concludes that the parties stood on equal footing when bidding on the Statement of Work. Additionally, the court concludes that the INS's eleven-month delivery schedule did not contravene Digital Biometrics's Blanket Purchase Agreement and Federal Supply Schedule. Therefore, the eleven-month delivery schedule comported with the Statement of Work. Consequently, the court concludes that ANADAC has not demonstrated a substantial likelihood of success on the merits on this basis as well. Accordingly, the court concludes that ANADAC has not met the heavy burden required for the issuance of a preliminary injunction. *See Marine Transp. Lines,* 623 F.Supp. at 335.

## IV. CONCLUSION

Having considered the plaintiff's motion, and oppositions thereto, as well as the administrative record, the court concludes that Plaintiff ANADAC has not demonstrated a substantial likelihood of success on the merits.[3] Therefore, the court concludes that ANADAC has failed to meet the heavy burden necessary for the issuance of a preliminary order. Accordingly, the court denies its request for a preliminary injunction. Because of this ruling, the court also denies ANADAC's motion

**3.** Because of this conclusion the court will not address the other three prongs of the prelimi-

for expedited discovery and to shorten the time for response.

Additionally, the court has not granted leave for INS to file its surreply memorandum in opposition to the plaintiff's request for a preliminary injunction, because the submission appears to constitute an opposition to ANADAC's reply memorandum and neither the local rules nor the court's January 27, 1999 Order granting ANADAC's and the INS's consent motion permits such a submission. Consequently, the court denies as moot ANADAC's motion to strike the surreply.