**VENCOR NURSING CENTERS, L.P.,
d/b/a Village Square Nursing and
Rehabilitation Center, Plaintiff,**

v.

**Donna E. SHALALA, Defendant.**

No. Civ.A. 99–CV–1553(RMU).

United States District Court,
District of Columbia.

July 8, 1999.

Counsel, U.S. Dep't. of Health & Human Servs., Health Care Financing Division, Washington, DC, for defendant, Donna E. Shalala as Secretary of the United States Department of Health & Human Services.

## MEMORANDUM OPINION

URBINA, District Judge.

**Denying the Plaintiff's Motion for a Temporary Restraining Order and Denying the Defendant's Request for a Transfer of Venue**

### I. Introduction

This matter comes before the court on an application by the plaintiff Vencor Nursing Centers, L.P. ("Vencor") for an order temporarily restraining the defendant, Secretary of the United States Department of Health and Human Services Donna E. Shalala ("HHS") from terminating one of Vencor's California facilities from the Medicare and Medicaid programs, and seeking other declaratory and injunctive relief. In opposition, HHS contends that this court lacks subject matter jurisdiction, that venue does not lie in this District or that the action should be transferred to California, and that Vencor has not met the criteria for preliminary injunctive relief. For the reasons which follow, the court finds that it has jurisdiction and that a transfer of venue is not warranted. The court also finds that Vencor has not met the criteria for issuance of a TRO and denies Vencor's application.[1]

### II. Background

Vencor owns and operates Village Square Nursing and Rehabilitation Center, a 120–bed skilled nursing facility in San Marcos, San Diego County, California ("Village Square"). During the relevant period, Village Square had between 92 and 104 residents, including about fifty Medicare and Medicaid beneficiaries. *Id.* ¶ 2.

Joseph L. Bianculli, Annaliese Impink, Law Office of Joseph L. Bianculli, Arlington, VA, for plaintiff, Vencor Nursing Centers, L.P., d/b/a Village Square Nursing and Rehabilitation Center.

Eric Jaffe, Assistant United States Attorney, U.S. Attorney's Office, Laura P. Schuler, Attorney, Office of the General

---

1. The motion to dismiss the complaint will be treated as a motion for summary judgment. *See* Fed.R.Civ.P. 65(a)(2). The motion will be decided following supplemental briefing under the schedule set forth in the attached order.

**4**

The defendant, HHS, is the federal agency responsible for administering the Medicare Act, 42 U.S.C. § 1395 *et seq.*, and the Medicaid Act, 42 U.S.C. § 1396 *et seq.* The California Department of Human Services ("the survey agency" or "SA") is the state agency that inspected Village Square on behalf of HHS. From November 1998 through May 1999, HHS authorized the SA to carry out three on-site surveys of Village Square.

The SA conducted the first survey on November 25, 1998 and issued a Statement of Deficiencies on November 28, 1998. Village Square filed a Plan of Correction (POC) on December 18, 1998 and notified the SA that it had regained substantial compliance as of January 9, 1999. *See* Compl. ¶ 30; Mot. to Dis., Ex. A at 1. The SA conducted a follow-up survey on April 1, 1999 and issued a Statement of Deficiencies, and Village Square submitted a POC. *See* Mot. to Dis., Ex. B; Compl. ¶ 31. On May 12, 1999, HCFA notified Village Square that it concurred with the SA's findings and terminated Village Square effective May 29, 1999 for failure to maintain substantial compliance for six months. *See* Mot. to Dis., Ex. D. In response to Village Square's representation that it was in substantial compliance, the SA conducted a third survey on May 28, 1999 and issued a Statement of Deficiencies on June 8, 1999.

HCFA exercised its discretion to continue payments until June 28, 1999, thirty days from the effective date of termination. *See* Mot. to Dis., Ex. D. Village Square relocated 18 Medicare and Medicaid residents by July 2, 1999 and it planned to relocate the others by July 5, 1999.[2]

## III. Discussion

### A. Subject–Matter Jurisdiction

Vencor appealed Village Square's termination and requested expedited administrative review to challenge the findings of

non-compliance. HHS contends that 42 U.S.C. § 405(g), (h) deprive this court of subject-matter jurisdiction during the pendency of that review. For the reasons which follow, the court disagrees and finds that it does have subject-matter jurisdiction.

### 1. The Statutory Administrative–Exhaustion Requirement

■ A claimant challenging the denial of a claim for Medicare benefits must pursue its administrative remedies before seeking judicial review:

Any individual, after any final decision by the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g). A parallel provision, § 405(h), imposes an exhaustion requirement on *Medicaid* benefit claims. HHS contends that these provisions bar this court from exercising jurisdiction until Vencor receives a final decision on its administrative appeal. In *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), the Supreme Court explained, "Exhaustion is generally required ... so that the agency may function effectively and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." *Id.* at 765, 95 S.Ct. 2457.

### 2. Exception to Exhaustion Requirement for Colorable Claims Which are "Collateral" to Any Claim for Benefits

■ The next year, however, *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47

**2.** Letter to court from Vencor's counsel, Joseph L. Bianculli, dated July 2, 1999.

L.Ed.2d 18 (1976), clarified that the Social Security Act's administrative-exhaustion requirement is not an absolute, unwaivable prerequisite to judicial review. *Eldridge* involved a due process challenge to the termination of Social Security disability payments without a prior evidentiary hearing. The Court held that the district court had authority to relieve a claimant from the exhaustion requirement even when HHS did not consider the challenged decision to be final. *See Eldridge*, 424 U.S. at 330–32, 96 S.Ct. 893. The decision whether or not to waive the exhaustion requirement depends on "the nature of the claim being asserted and the consequences of deferment of judicial review." *Id.* at 331 n. 11, 96 S.Ct. 893. Waiver was appropriate because (1) "the claimant's interest in having his constitutional challenge resolved promptly [was] so great that deference to the agency's judgment [that exhaustion was required was] inappropriate"; and (2) the constitutional challenge was "collateral" to any claim for benefits. *Id.* at 329–31, 96 S.Ct. 893; *accord Bowen v. City of New York*, 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986).

**3. What Constitutes A Colorable Claim.** A claimant cannot circumvent an exhaustion requirement by asserting specious "constitutional" claims to "dress up" what is essentially a claim for benefits. *See Bartlett v. Bowen*, 816 F.2d 695, 702 (D.C.Cir.1987) ("This holding will not afford much opportunity for frivolous claims since aggrieved claimants must find a way to connect their claims for benefits to a constitutional infirmity...."). Rather, the constitutional claim must be "colorable," i.e., it must not be "wholly insubstantial, immaterial or frivolous." *Boettcher v. HHS*, 759 F.2d 719, 722 (9th Cir.1985); *see, e.g., Thorbus v. Bowen*, 848 F.2d 901,

903 (8th Cir.1988) ("Although we deem the facts marginal to support a colorable claim, we assume without deciding that Dr. Thorbus has stated a constitutional claim sufficiently colorable for the purposes of jurisdiction in federal court."). Whether or not Vencor's claims are meritorious remains to be seen, but they are not "wholly insubstantial, immaterial or frivolous."

**4. Claims which are Collateral to any Claim for Payment of Benefits.**

The next inquiry is whether Vencor's claims are "collateral to [its] substantive claim of entitlement...." *Mathews*, 424 U.S. at 329–331, 96 S.Ct. 893. The Court of Appeals has not addressed this issue. Three consecutive decisions of this court, however, have held that a claim challenging HHS's constitutional authority to terminate or asserting that HHS failed to adhere to the requirements of the Medicare Act in terminating benefits is "entirely collateral" to a claim for benefits. Therefore, these decisions concluded, the challenges to termination were not subject to the requirement of exhaustion of administrative remedies in section 405. *See Mediplex v. Shalala*, No. 98–CV–2440 (D.D.C. Nov. 11, 1998); *Libbie Rehab. Ctr. v. Shalala*, 26 F.Supp.2d 128, 130–31 (D.D.C. 1998); *International Long Term Care v. Shalala*, 947 F.Supp. 15, 17–19 (D.D.C. 1996). No decision in this Circuit has held to the contrary. Accordingly, it does not appear likely that the court will depart from the "strong presumption that Congress intends judicial review of administrative action...." *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986). Vencor was not required to exhaust administrative remedies,[3] and this court has gen-

---

**3.** Moreover, because the administrative law judges (ALJ's) are not empowered to consider Vencor's constitutional claims, requiring Vencor to await the results of administrative review would be futile with regard to those claims. *See* 42 C.F.R. § 498.3(d)(11) (neither ALJ's nor HHS Appeals Council has the au-

thority to determine that a regulation or procedure is unconstitutional or *ultra vires*, or that the deficiencies found do not lawfully support the remedy imposed); May 12, 1999 Notice of Termination, Mot. to Dis., Ex. D at 3 ("You may appeal the findings/certifications of noncompliance which led to the enforce-

eral federal-question jurisdiction pursuant to 28 U.S.C. § 1331.

### B. Venue

HHS also argues that 42 U.S.C. § 405(g) provides only one appropriate venue for this action—the United States District Court for the Southern District of California. In the alternative, HHS moves for transfer of venue pursuant to 28 U.S.C. § 1404(a). For the reasons which follow, the court denies HHS's request to transfer.

### 1. 42 U.S.C. § 405(g) does not apply.

■■■ Under § 405(g), a lawsuit challenging an administrative denial of benefits "shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business...." 42 U.S.C. § 405(g). In this case, however, § 405(g) and (h) do not apply, because this action is collateral to any claim for benefits.

Accordingly, venue will be determined in accordance with the customary principles:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in ... (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated....

28 U.S.C. § 1391(b). Under § 1391(b), venue is proper in this District, as the Secretary is deemed to reside here when she is sued in her official capacity. *See Archuleta v. Sullivan*, 725 F.Supp. 602, 605 (D.D.C.1989). Venue would also lie, however, in California, where most of the "events and omissions giving rise to the claim ... occurred."

### 2. Transfer of Venue under 28 U.S.C. § 1404(a) is Not Warranted

■■■ HHS contends that this action should be transferred to California pursuant to 28 U.S.C. § 1404(a). That section provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The court has broad discretion to determine whether to transfer an action under § 1404(a). *See Rhee Bros., Inc. v. Seoul Shik Poom, Inc.*, 869 F.Supp. 31, 33–34 (D.D.C.1994) (citation omitted). The factors to consider in exercising that discretion include the preference given to plaintiff's choice of forum; the convenience of the parties and witnesses; the location of the record; and the interest of justice. *See Hawksbill Sea Turtle v. FEMA*, 939 F.Supp. 1, 3 (D.D.C. 1996). The interest-of-justice factor encompasses the desire to avoid multiple litigation from a single transaction, to try related litigation together and to consider the regional nature of the dispute. *See id.*

■■■ "The most critical factor to examine under 28 U.S.C. § 1404(a) is the convenience of the witnesses," as well as the availability of compulsory process to compel the attendance of potential witnesses. *See Chung v. Chrysler Corp.*, 903 F.Supp. 160, 164 (D.D.C.1995). In this case the potential witnesses—Village Square's staff and residents and the SA survey teams—reside beyond this court's subpoena power, *see* Fed.R.Civ.P. 45(b)(2), and they have no apparent connection to the District of Columbia.[4] This nexus with California, however, is not sufficient to warrant transfer of an action which is also properly venued here.

---

ment action, but you cannot appeal the enforcement remedy [termination] itself"); *cf. Tataranowicz v. Sullivan*, 959 F.2d 268 (D.C.Cir.1992), *cert. den.*, 506 U.S. 1048, 113 S.Ct. 963, 122 L.Ed.2d 120 (1993) (exhaustion would have been futile).

4. Vencor contends that the presence of counsel in the District weighs against transfer. This is not the basis for the court's denial of HHS's transfer request. "The location of counsel carries little, if any, weight in an analysis under § 1404(a)." *Armco Steel Co. v. CSX Corp.*, 790 F.Supp. 311, 324 (D.D.C. 1991) (citation omitted).

Under the proper circumstances, this court has transferred actions even though one of the parties was a federal agency located in the District. The court has generally done so, however, when the transferee forum was home to witnesses whose testimony was necessary to resolve the matter. *See, e.g., SEC v. Ernst & Young,* 775 F.Supp. 411 (D.D.C.1991). Here, by contrast, the court does not foresee any need for testimony, nor have the parties indicated that they intend to request an evidentiary hearing or trial at which they would call witnesses. Consequently, the "convenience of the witnesses" does not favor transfer. *See Concerned Rosebud Area Citizens v. Babbitt,* 34 F.Supp.2d 775, 776 (D.D.C.1999) (declining to transfer, because issues could be decided solely on basis of administrative record). This renders inapposite the cases cited by HHS where this court granted transfer to the state where the nursing home and SA were located.

Likewise, the "location of the record" does not favor transfer. The parties' submissions have supplied a sufficient record for the court to decide their claims. Lastly, neither the convenience of the parties nor the interest of justice favor transfer. The parties have not notified the court of any litigation in another federal court concerning this dispute, nor is this dispute "regional" in nature. The statutes, regulations and guidelines involved are of national scope, and Vencor's challenges to their application are of concern to HHS and to skilled nursing facilities nationwide. For these reasons, HHS's request for a transfer will be denied.

### C. The Standard for Preliminary Injunctive Relief

█ A preliminary injunction may be granted only when the movant demonstrates:[5]

(1) a substantial likelihood of success on the merits;[6] (2) that irreparable harm will result in the absence of the relief requested; (3) that no other party will be harmed if the motion is granted; and (4) that the public interest supports granting the requested relief.

*ANADAC, Inc. v. INS,* 44 F.Supp.2d 306, 308 (D.D.C.1999). These four factors are not considered in isolation from one another, and no one factor is necessarily dispositive. Rather, the factors "interrelate on a sliding scale and must be balanced against each other." *Davenport v. International Brotherhood of Teamsters,* 166 F.3d 356, 361 (D.C.Cir.1999). A particularly strong showing on one factor may compensate for a weak showing on another factor. *See Serono Labs. v. Shalala,* 158 F.3d 1313, 1318 (D.C.Cir.1998). If the plaintiff makes a particularly weak showing on one factor, however, the other factors may not be enough to "compensate." *See Taylor v. RTC,* 56 F.3d 1497, 1506 (D.C.Cir.), *amended on reh'g,* 66 F.3d 1226 (D.C.Cir. 1995). For the reasons which follow, this court concludes that Vencor is not entitled to a TRO.

### D. No Strong Showing of Likely Success on the Merits on Claim That Secretary Lacked Authority to Terminate Absent Immediate Jeopardy.

█ The gravamen of Vencor's dispute with HHS is its contention that a nursing home may be terminated from Medicare and Medicaid participation only where conditions at the facility ·place residents' health or safety in "immediate jeopardy." Therefore, Vencor argues, by terminating Village Square in the absence of a finding of "immediate jeopardy" HHS violated the Medicare Act, the Medicaid Act and the

---

**5.** The same factors necessary to obtain a preliminary injunction apply when a TRO is sought. *See Boehringer Ingelheim Corp. v. Shalala,* 993 F.Supp. 1 (D.D.C.1997).

**6.** The movant must make a "strong showing" of likely success on the merits. *See Washington M.A.T. Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841 (D.C.Cir.1977).

Due Process Clause. *See* Compl., Counts I and II. Conversely, HHS relies on 42 C.F.R. §§ 488.412 and 488.456, which provide that HHS may terminate a facility which is not in "substantial compliance," even if there is no immediate jeopardy.

■ In deciding whether this court is likely to adopt Vencor's interpretation of the remedy provisions, the court accords substantial deference to HHS's regulations. *See Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Broad deference is particularly warranted where the regulation "concerns a complex and highly technical regulatory program", like Medicare, "in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 114 S.Ct. 2381, 2383, 129 L.Ed.2d 405 (1994) (citation omitted).

The Medicare and Medicaid acts authorize HHS to impose a variety of remedies and/or sanctions against noncompliant nursing homes. Prior to 1987 the only available remedies were outright termination or a blanket ban on reimbursement for care of newly admitted residents. *See* 57 Fed.Reg. 39,278–39,279 (1992). While the Medicare Act formerly permitted termination without a finding of "immediate jeopardy," 42 U.S.C. § 1395cc(f), that provision is no longer in force. In 1987 Congress enacted the Federal Nursing Home Reform Act, which added a greater variety of remedies to the Medicare and Medicaid Acts. These new remedies include, *inter alia,* civil money penalties, imposition of independent temporary managers and orders to adopt plans of correction (POC's). The 1987 legislation establishes categories of non-compliance and provides a number of possible remedies for HHS to choose from based on the severity of the alleged noncompliance. As amended, the Medicare Act now provides, in pertinent part,

(2) SECRETARIAL AUTHORITY. (A) IN GENERAL.— . . . *if . . . pursu-* *ant to a recommendation of the State under paragraph (1) finds, that a skilled nursing facility no longer meets [the required operating procedures], and further finds that the facility's deficiencies —*

\* \* \* \* \* \*

(ii) *do not immediately jeopardize the health or safety of its residents, the Secretary may impose any of the remedies described in subparagraph (B).*

\* \* \* \* \* \*

(B) Specified Remedies.—The Secretary may take the following actions with respect to a finding that a facility has not met an applicable requirement:

(i) Denial of Payment—. . . with respect to such individuals admitted to the facility after the effective date of the finding.

(ii) Authority with Respect to Civil Money Penalties . . . .

(iii) Appointment of Temporary Management . . . .

42 U.S.C. § 1395i–3(h)(2) (emphasis added). The Medicaid Act contains a parallel provision providing, in pertinent part,

(3)(b) Other nursing facilities

[I]f the Secretary finds that a nursing facility no longer meets a requirement of subsection (b), (c), (d), or (e) of this section, and further finds that the facility's deficiencies—

\* \* \* \* \* \*

(B) do not immediately jeopardize the health or safety of its residents, the Secretary may impose any of the remedies described in subparagraph (C).

*Nothing in this paragraph shall be construed as restricting the remedies available to the Secretary to remedy a nursing facility's deficiencies.*

*See* 42 U.S.C. § 1396r(h)(3) (West Supp. 1999) (emphasis added).

Defendants contend that under these provisions, HHS has authority to terminate regardless of the presence of immediate jeopardy. There are two provisions in the Medicare Act which tend to support HHS's position. First, Congress explicitly states, "Nothing in this subparagraph shall be construed as restricting the remedies available to HHS to remedy a skilled nursing facility's deficiencies." 42 U.S.C. § 1395i–3(h)(2)(B). Second, the Act authorizes HHS to terminate the Medicare agreement of any provider which "fails to comply substantially with the provisions of the agreement, with the provisions of this subchapter and regulations thereunder. . . ." 42 U.S.C. § 1395cc(b)(2). As the compliance provisions are "provisions of this subchapter" and § 1395cc(b)(2) does not require a finding of immediate jeopardy prior to termination, the court could infer that HHS is entitled to terminate without immediate jeopardy.

Several courts which have addressed the issue have held that HHS does not have the authority to order termination in the absence of immediate jeopardy. In *Claridge House v. HHS*, 795 F.Supp. 1393 (S.D.Ohio 1991), for instance, a U.S. District Court determined that the "notwithstanding" clause of section 1396r(h)(3) did not preserve an implicit power to terminate absent immediate jeopardy. *Id.* at 1404. The court reasoned that if HHS could terminate with or without immediate jeopardy, there would be little point in the statute's distinction between the two situations. *Id.*

Vencor has not shown that this court is likely to follow *Claridge House*. This Circuit has yet to decide whether or not HHS may terminate absent a finding of immediate jeopardy. *See Libbie Rehab Center*, 26 F.Supp.2d at 132 (because temporary manager of facility indicated facility was back in substantial compliance and ready to be resurveyed, there was a strong likelihood facility would be reinstated, and no

need to decide scope HHS's power to terminate). Moreover, as evinced by the decisions of other district courts, there is a solid rationale for finding that HHS has authority to terminate absent immediate jeopardy. First, this court disagrees that allowing HHS to terminate a facility absent immediate jeopardy would render meaningless the distinction between jeopardy and non-jeopardy situations. In enacting the enforcement provisions to the Medicare and Medicaid Acts, Congress expressly wished to expand the panoply of remedies available to HHS. *See* H.R.Rep. No. 391(I), 100th Cong., 1st Sess., 475, *reprinted in* 1987 U.S.C.C.A.N. 2313–1, 2313–295. Committee reports noted with concern the "yo-yo" phenomenon in which noncomplying facilities temporarily correct their deficiencies before an on-site survey and then quickly lapse into noncompliance until the next review. *Id.* at 2313–291. Presumably, the new version of the statute ameliorates this problem by giving HHS a set of intermediate sanctions to choose from rather than the extreme choices of termination or no sanction. There is no indication in the legislative history that Congress wished to limit HHS's ability to terminate a persistently noncompliant facility. *See Lake County Rehab. Ctr. v. Shalala*, 854 F.Supp. 1329, 1340 (N.D.Ind. 1994). In fact, the recurring theme emerging from the legislative history is that the new provisions would grant HHS remedial powers *in addition* to those already available. *See* 1987 U.S.C.C.A.N. at 2313–291 through 2313–296; *see also* 42 C.F.R. § 1395i–3(h)(5) ("[T]he remedies provided . . . are in addition to those otherwise available under State or Federal law and shall not be construed as limiting such other remedies.").

Against this backdrop, the court could well conclude that the statute should be read as a guidepost for HHS rather than a limitation on its power.[7] The immediate-

---

7. This court also disagrees with *Claridge House* 's conclusion that termination is not a

"remedy." Termination may be considered a remedy because it requires a facility to cor-

jeopardy provision mandates that HHS *must* terminate or appoint temporary management when a facility's deficiencies are found to put residents' health or safety in immediate jeopardy. By contrast, the non-jeopardy provision affords HHS discretion, allowing (but not requiring) HHS to impose intermediate sanctions on facilities whose deficiencies do not immediately jeopardize health or safety. In light of the foregoing, Vencor has not shown that this court is likely to hold that 14HS lacked authority to terminate Village Square absent a finding of immediate jeopardy.

### E. No Strong Showing of Likely Success on the Merits on Claim That Survey Process Violated APA and Due Process

 Vencor alleges that the HHS's survey procedure violated Vencor's due process rights. A "procedural due process claim necessitates a property deprivation of constitutional magnitude and, of course, one effected without due process." *Sherwin Manor v. McAuliffe*, 37 F.3d 1216, 1220 (7th Cir.1994), *cert. den.*, 516 U.S. 862, 116 S.Ct. 172, 133 L.Ed.2d 113 (1995). "Health care providers have a constitutionally protected property interest in continued participation in the Medicare and Medicaid programs...." *Patchogue Nursing Ctr. v. Bowen*, 797 F.2d 1137, 1144-45 (2d Cir.1986), *cert. den.*, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987). Accordingly, due process encompasses Vencor's claim that improper survey procedures contributed to the deprivation of its property interest.

#### 1. *Failure to Re–Survey*

Village Square complains that HHS "refused to revisit the facility to determine whether Village Square has corrected the deficiencies cited during the latest survey, notwithstanding the fact that [HHS's] own State Operations Manual ('SOM') specifi-

cally calls for such a revisit." Mot. for TRO at 19–20. After HHS notified Village Square of its termination on May 12, 1999, the SA conducted a follow-up survey on May 28, 1999. Thus, the issue is whether HHS was required to re-survey Village Square *a second time* following the decision to terminate.

Vencor has not shown that it is likely to prevail on this claim. Vencor does not point to any section of the SOM which obligates HHS to conduct a re-survey. The court has identified two SOM provisions which address re-survey, but neither states that a facility "must" or "shall" be re-surveyed following a finding of deficiencies. Section 2732 provides, in pertinent part,

> A. Post-survey Revisit. The SA follows up on all deficiencies cited in the POC .... an onsite visit is *generally* required for deficiencies concerning quality of care. Because the LTC [long-term care] Survey process focuses on the care of the resident, revisits are *almost always* necessary to ascertain whether the deficiencies have indeed been corrected.... *If* documentary or *onsite verification is warranted,* the [SA] obtains appropriate verification before reporting a deficiency as corrected. The revisit (or mail or telephone contact) requires that the [SA] complete a Post–Certification Revisit Report (Form HCFA–2567B).

Emphasis added. Appendix P of the SOM, which elaborates on the survey procedures for long-term care facilities in greater detail, also addresses follow-up surveys:

> The purpose of the post-survey revisit (follow-up) is to re-evaluate the specific care and services that were cited as non-compliant during the original standard, abbreviated standard, extended or partial extended survey(s). Ascertain the status of corrective actions being taken

rect its deficiencies and regain substantial compliance before it may be readmitted to Medicare. *See Lake County,* 854 F.Supp. at

1340; *see also* 1987 U.S.C.C.A.N. at 2313–295 (including termination in the "set of remedies" which Secretary has at her disposal).

on all requirements not in substantial compliance.

* * * * * *

Because this survey process focuses on the care of the resident, revisits are *almost always* necessary to ascertain whether the deficient practices have indeed been corrected.

Emphasis added. *See* 42 C.F.R. § 488.110(1). The highlighted portions of these SOM provisions clearly reserve HHS discretion as to whether or not to authorize a re-survey.

2. *Use of Survey Forms and Procedures not Published for Public Notice and Comment*

Vencor also complains that HHS used survey forms and procedures which it has never subjected to public notice and comment. In so doing, Vencor alleges, HHS violated the Medicare Act, the APA and the Due Process Clause. *See* Compl., Counts III – V; Opp. to Mot. to Dis. at 21–23. For purposes of this TRO application, the court assumes *arguendo* that HHS did use forms and procedures which it has not subjected to notice and comment. Nonetheless, for the reasons which follow, the court concludes that Vencor is not substantially likely to prevail on this claim.

Vencor alleges that the use of unpublished survey guidelines violated the Medicare Act. The Act provides, in pertinent part,

No rule, requirement or other statement of policy (other than a national [benefits] coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities or organizations to furnish or receive services or benefits under [the Medicare Act] shall take effect unless it is promulgated by the Secretary by regulation.

42 U.S.C. § 1395hh. Vencor also alleges that HHS's use of unpublished survey guidelines violated the APA's procedural rule-making requirements. The APA provides, in pertinent part,

General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law.

5 U.S.C. § 553(b). Substantive rules not promulgated in accordance with these requirements are invalid and will not be enforced. *See, e.g., Linoz v. Heckler,* 800 F.2d 871, 876–78 (9th Cir.1986). Conversely, an agency is not bound by the APA when announcing so-called "interpretive rules." The APA provides, "Except when notice or hearing is required by statute, this subsection does not apply—(A) to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice...." 5 U.S.C. § 553(b)(3)(A).

The Medicare Act expressly incorporates the APA's exemption for interpretive rules. *See* 42 U.S.C. 1395hh(b)(2)(C). The court treats the Medicare Act's exemption for interpretive rules as identical to the APA's. *See Medics, Inc. v. Sullivan,* 766 F.Supp. 47, 51 (D.P.R.1991), *aff'd sub nom. La Casa Del Convaleciente v. Sullivan,* 965 F.2d 1175 (1st Cir.1992).

"[R]egulations, substantive rules or legislative rules are those which create law, usually implementary to an existing law; whereas interpretive rules are statements as to what the administrative officer thinks the statute or regulation means." *Cabais v. Egger,* 690 F.2d 234, 238 (D.C.Cir.1982) (citation omitted). Vencor asserts, "The Secretary's survey and enforcement policies and procedures obviously govern the eligibility of entities to furnish services...." Opp. to Mot. to Dis. at 21. This statement is imprecise and does not support the conclusion Vencor urges upon the court. The forms and procedures complained of may "relate to" a facility's eligibility to be paid under Medicare/Medicaid, but they do not "govern" eligibility. At this point Vencor has not

shown that the SOM provisions either "establish" or "change a substantive legal standard governing" eligibility to receive Medicare payments. That standard is set forth in regulations which have passed through the requisite process of publication and public comment. Vencor has not presented evidence that the SOM does more than "announce[ ] how the agency believes the [Medicare] statute should be enforced." *American Society of Cataract & Refractive Surgery v. Bowen*, 725 F.Supp. 606 (D.D.C.1989). The SOM's provisions on procedures specify the means by which the SA should collect and analyze information about a facility's compliance with regulatory standards. The SOM's forms, in turn, set forth the format in which the SA should summarize the information gathered and report its conclusions to HHS. Therefore, this court is not substantially likely to find that the SOM survey provisions are substantive rules subject to the notice-and-comment requirements of the APA and the Medicare Act. *Cf. In Matter of Assessment Issued to Leisure Hills Health Care Center*, 518 N.W.2d 71 (Minn.App.1994) (nursing-home inspection procedures were not subject to state APA's rulemaking requirements).

### F. The Balance of Hardships Does Not Weigh in Favor of a TRO

In light of this court's conclusion that the plaintiff is not likely to succeed on the merits, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport v. Teamsters*, 166 F.3d 356, 366 (D.C.Cir.1999). The plaintiff here has not made such a showing. Vencor contends that the denial of a TRO will cause three types of irreparable harm: "transfer trauma" to Village Square's residents, monetary harm to Village Square and Vencor's being forced to undergo the arduous process of administrative review. HHS responds that Village Square's residents will be irreparably harmed if they are allowed to remain in a facility which is not adequately providing

for their health and safety. For the reasons which follow, the court concludes that the "balance of harms" does not weigh in favor of a TRO.

### 1. Harm to Wage Squares Residents

■ The court may consider subjective, psychological harm in its irreparable-harm analysis. *See, e.g., The Fund for Animals v. Clark*, 27 F.Supp.2d 8, 14 (D.D.C.1998). This court is not unmindful of the emotional distress which the elderly residents of Village Square may experience upon their relocation. *See* Mot. for TRO, Ex. 1. For many residents, it is of little solace that they are being transferred to new facilities which can provide better care and treatment than Village Square. Rather, relocation removes residents from an environment which some may consider "home." *See Lexington Management Co. v. Missouri DSS*, 656 F.Supp. 36, 41 (W.D.Mo.1986) (trauma "commonly affects nursing home residents who are suddenly forced to vacate familiar surroundings"). Because residents are not being transferred to the same facility, they may lose the friendships they have forged with other residents. Just as important, the residents' new facilities may be farther from their families, making it difficult for them to see their loved ones. *See id.*, Aff. of Sanford ¶ 2 (because Village Square is 2.5 miles away, husband visits wife three times a day). Lastly, the residents may be moved further from their physicians. *See* Mot. for TRO, Ex. 1 at ¶ 4. Such "transfer trauma" is properly treated as part of the irreparable harm which will result from denial of a TRO.

### 2. Harm to Village Square and Vencor

a. *Monetary Loss and Possible Closure*

■ Given that nearly 50 of Village Square's 90–100 residents are Medicare/Medicaid beneficiaries, the court finds credible Village Square's claim that it will

suffer substantial monetary loss if a TRO does not issue. Even if there is some risk that Vencor will eventually close Village Square, "foreseeable long-term effects do not entitle the [applicant] to preliminary, injunctive relief." *National Treasury Employees Union v. U.S.*, 927 F.2d 1253, 1255 (D.C.Cir.1991). *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985) ("Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time....") (citation omitted).

■ In any event, monetary loss is usually accorded little or no weight in the irreparable-harm analysis. *See Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."); *Davenport*, 166 F.3d at 367 (fact that rule change eliminated flight attendants' per diem pay and hotel allowances did not constitute irreparable injury, because it could be remedied with money damages).

b. *The Ordeal of Administrative Review*

■ As a matter of law, neither the burden of pursuing administrative appeal nor the burden of prosecuting the instant action can constitute "irreparable harm" to Vencor. A litigant "may not allege the drain on its resources from conducting this litigation as injury in fact. This position, which would enable every litigant automatically to create injury in fact by filing a lawsuit, has been expressly rejected by the Supreme Court." *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 799 n. 2 (D.C.Cir. 1987); *see also P.I.A. Amarillo v. Sullivan*, 1992 WL 88035, *5 (D.D.C.1992) (no cognizable harm in being "forced to seek immediate judicial relief, at great time and expense").

**3. Balance of Harms is Neutral or Weighs Against the TRO**

Under the standard for preliminary injunctive relief, however, transfer trauma and the harm to Village Square do not warrant issuance of a TRO. Those harms must be balanced against the harm to residents that would result if they were allowed to remain in a facility which has been found not to comply with HHS's health and safety standards. After all, if the TRO is denied, Village Square's residents will be relocated to facilities which HHS finds *are* in substantial compliance with those standards. Thus, relocation may ultimately tend to improve the residents' care and well-being.

■ Moreover, even if the court concluded that the "balance of harms" weighed in favor of a TRO, that alone would not warrant issuance of a TRO. Preliminary injunctive relief is an "extraordinary remedy" which generally will not issue unless the movant satisfies all four criteria, including a "strong showing" of "likely success on the merits." *See, e.g., Tenacre Foundation v. INS*, 78 F.3d 693 (D.C.Cir.1996). A showing that the balance of hardships strongly favors injunctive relief could compensate for a less than compelling showing of likely success on the merits. "When the balance [of the hardships] tips decidedly in favor of the plaintiff ... a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Rum Creek Coal Sales v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991) (citation omitted). This is of no avail to Vencor, as the balance of hardships does not tip in its favor.[8]

8. The extensive record of deficiencies suggests that the public-interest does not favor a TRO. *See Sheepshead Nursing Home v. Heckler*, 595 F.Supp. 992, 997 (S.D.N.Y.1984) (home not entitled to injunction against termination, even though it would be forced to close if injunction were denied, because public interest in protecting residents was more compelling in light of evidence of inadequate care over period of 18 months).

14

## IV. Conclusion

For the foregoing reasons, this Court concludes that it has the jurisdiction to hear the plaintiff's motion but that the applicant has not met the requirements for the issuance of preliminary injunctive relief. Accordingly, Vencor's application for a temporary restraining order is denied.

An Order denying the plaintiff's motion for a temporary restraining order was separately executed and issued on the 28th day of June, 1999.